**Melvin GALE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 12263.

District of Columbia Court of Appeals.

Argued March 8, 1978.

Decided Aug. 1, 1978.

As Amended Sept. 20, 1978.

Craig W. Hulvey, Washington, D.C., appointed by this court, for appellant.

Jay B. Stephens, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Judith Hetherton, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

YEAGLEY, Associate Judge:

Appellant was convicted by a Superior Court jury on February 28, 1977, of one count of first-degree burglary and one count of grand larceny. His motion for a new trial was denied on March 24, 1977, and he was sentenced subsequently to 12–40 years on the former charge and a concurrent 3–9 years on the latter.

The circumstances which gave rise to the charges occurred at a rooming house in Northwest Washington on the morning of January 22, 1976, and were developed by the victims' testimony at trial. The owner of the rooming house testified that a color television and a slipcover had been taken from the premises, that he had seen appellant at the house previously, and that appellant's former lawyer reimbursed him for the cost of the stolen items. The lawyer testified that he had, indeed, reimbursed the victims on appellant's behalf.

One resident of the house told the jury that stereo and tape equipment had been removed from his room, and that he received restitution from appellant's lawyer. Another resident testified that her tape recorder was missing from her room, that she had been similarly compensated for the theft, and that she subsequently received a call from an individual who identified himself as appellant and who expressed his desire that she not testify against him. Yet another witness testified that he had observed appellant's departure from the premises with a television set on the morning in question. He positively identified appellant from a photo array, a slide series, and a lineup, and ultimately identified him in court. Finally, Detective Curtis Arnold testified that appellant had expressed to him the belief that the complainants would drop the charges if the stolen property were returned, and that appellant had indicated a determination to do so.

Appellant presented three alibi witnesses, the sum of whose testimony was that appellant had been repairing an automobile parked in front of their home on the morning in question, and that appellant and a

friend left at about 10:30 a. m. to purchase a part for the vehicle.

Appellant raises three contentions here. The first relates to the Interstate Agreement on Detainers Act (18 U.S.C.A. (Appendix), D.C.Code 1973, § 24–701). The second is in connection with the testimony of his former attorney. The third is with respect to the unavailability of two alibi witnesses and the trial court's refusal to compel their attendance, to grant a continuance, and to grant a new trial. For the reasons which follow, we affirm.

## I

■ Appellant contends that violations of the Interstate Agreement on Detainers Act (hereinafter IAD) deprived the trial court of jurisdiction over him, and that the indictment should therefore have been dismissed. Appellant says that he was transferred on several occasions to Superior Court from Lorton Reformatory, where he was incarcerated for a District Court conviction, and that the attendant failure to try him in Superior Court prior to his being returned to Lorton precluded subsequent Superior Court proceedings against him on the instant charges.[1]

We note at the outset that appellant's removal to Superior Court for trial of this case was not brought about by the filing of a detainer. Appellant was rather the subject of a "come-up" order initiated by the Office of the United States Attorney on a standard "Prisoner Transfer Request" form. A "come-up" order is an administrative notice from the Superior Court clerk's office to the United States Marshall's Service to make available for some phase of a criminal proceeding a defendant who is incarcerated in one of the several District of Columbia prison facilities. It involves only the intra-jurisdictional transfer of prisoners, and thus differs from a detainer, which is a notice to authorities in a foreign jurisdiction that a named individual is wanted on a felony or arrest warrant for criminal proceedings in this jurisdiction.

Requests for a "come-up" may be made to the clerk's office by the United States Attorney, a Superior Court judge or his or her clerk, a courtroom clerk, or by this court. The Marshall's Service is responsible for transmitting the order to the facility and for securing the defendant's presence on the following day. The granting of a "come-up" order is routine and is rarely the product of an independent judicial determination. This differs from a detainer, the filing of which does not, in and of itself, effect the transfer of a prisoner from one authority to another, and which requires an additional judicial or executive decision similar to that made in a removal or extradition proceeding.

The issue raised by appellant's contention presents us with a question of first impression. We must decide whether to treat a "come-up" order as a detainer, triggering application of the IAD. The government argues that a "come-up" order is not a detainer and that the IAD thus does not apply. The government asserts that the IAD is not the exclusive means of effecting the transfer of prisoners, and suggests an analogy to decisions of several federal circuit courts which have held that a detainer is not the sole means of obtaining custody of a prisoner, and that when the United States gains custody by use of a federal writ of habeas corpus ad prosequendum, it is not subject to the provisions of the IAD.

1. It is well settled that where a prisoner has been transferred under the IAD by a sending state to a receiving state to answer pending criminal charges, and then returned to the original place of imprisonment prior to disposition of those charges, the receiving state must dismiss the pending charges with *prejudice. E. g., United States v. Kenaan,* 422 F.Supp. 226, 228 (D.Mass.1976), *rev'd on other grounds,* 557 F.2d 912 (1st Cir. 1977); *United States ex rel. Esola v. Groomes,* 520 F.2d 830 (3d Cir. 1975).

Article II(b) of the IAD defines "sending state" in part as the "State in which a prisoner is incarcerated . . . at the time that a request for custody or availability is initiated," and article II(c) defines "receiving state" in part as the "State in which trial is to be had on an indictment, information, or complaint . . . ." Article II(a) provides that the United States shall be deemed a "state" under the IAD.

E. g., *Ridgeway v. United States,* 558 F.2d 357 (6th Cir. 1977); *United States v. Kenaan,* 557 A.2d 912 (1st Cir. 1977); *United States v. Scallion,* 548 F.2d 1168 (5th Cir. 1977); *United States v. Ricketson,* 498 F.2d 367 (7th Cir.), *cert. denied,* 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974).

Indeed, subsequent to the filing of briefs and presentation of oral argument in the case at bar, the Supreme Court vindicated the government's view in *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). The Court reversed the Second Circuit and held that "a writ issued by a federal court to state authorities, directing the production of a state prisoner for trial on criminal charges, is not a detainer within the meaning of the Agreement and thus does not trigger application of the Agreement." *Id.* at 349, 98 S.Ct. at 1841. We find this holding dispositive of the instant contention.

■ The primary purpose of the IAD is to encourage the expeditious disposition of charges pending against a prisoner in another jurisdiction and, consequently, to minimize the adverse impact of foreign prosecutions on rehabilitative programs to be undertaken during incarceration in the original jurisdiction. *United States v. Mauro, supra* at 349, 98 S.Ct. 1834; *United States ex rel Esola v. Groomes,* 520 F.2d 830 (3d Cir. 1975). The historical abuses which compelled enactment of the IAD have been described as follows:

Prior to the Agreement, detainers were filed indiscriminately, often with no notification to the prisoner, on mere suspicion, and without procedural safeguards. Outstanding detainers frequently provided grounds for denial of parole, participation in special work, athletic and release programs, visiting privileges, and minimum security status. Normally, a prisoner was required to serve out his sentence in the first jurisdiction before being tried in the second, impeding chances for successful rehabilitation, hindering judges in rendering appropriate sentences, preventing concurrent service of sentences in the two jurisdictions and, as indicated in Article I of the Agreement, hindering parole and prison authorities in devising an appropriate rehabilitation program for the prisoner concerned. Long delays before trial in the second jurisdiction were prejudicial to the prisoner's defense as evidence was lost, witnesses disappeared, and memories faded. The mechanics of transfer were complicated by an absence of uniform rules and states were often reluctant to give up prisoners at all. The Agreement was specifically designed to remedy these problems by clearing detainers against a prisoner through prompt disposition of charges in another jurisdiction. [*United States v. Kenaan, supra* at 916 (footnote omitted).]

In declining to hold the IAD applicable to federal habeas writs, the First Circuit had observed that these abuses are not threatened when the transfer is effected by a habeas writ:

A writ of habeas corpus ad prosequendum, however, has never been associated with any of the foregoing problems. As a court order, it is carried out immediately and is discharged when the prisoner is returned to state custody, unlike the detainer which had remained outstanding against the prisoner prior to the Agreement. While federal charges may remain pending against a prisoner after discharge of a writ, as was the case following Kenaan's unaccepted offer of a guilty plea, that situation does not involve the potential for abuse intended to be corrected by the Agreement. [*Id.* at 916 (footnote omitted); *see also Ridgeway v. United States, supra* at 362.]

The Supreme Court found this reasoning persuasive:

The adverse effects of detainers that prompted the drafting and enactment of the Agreement are thus for the most part the consequence of the lengthy duration of detainers.

. . . . .

Because writs of habeas corpus *ad prosequendum* issued by a federal court pursuant to the express authority of a federal statute are immediately executed, en-

actment of the Agreement was not necessary to achieve their expeditious disposition. . . . When the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum,* the problems that the Agreement seeks to eliminate do not arise. [*United States v. Mauro, supra,* 436 U.S. at 360, 98 S.Ct. at 1847.]

We find, similarly, that the potential for abuse which underlay enactment of the IAD is not present in the case at bar, in which transfer of custody was effected by a "come-up" order. Such an order, like the federal habeas writ, involves a short, minor intrusion into the institutional life of its subject.[2]

In the instant case, the record shows that appellant was brought from nearby Lorton Reformatory, which is operated by the District of Columbia Department of Corrections by authority of D.C.Code 1973, § 24–442, and where he had been imprisoned on a federal charge, to attend proceedings in Superior Court on five separate days in the course of a six-month period between November 1, 1976, and April 21, 1977. Following each "come-up" and resultant court appearance he was returned immediately to Lorton. This is simply not the kind of

interference with incarceration to which the IAD is addressed. We hold, accordingly, that because a "come-up" order works the same limited intrusion into the institutional life of its subject as a federal writ of habeas corpus ad prosequendum, it is not to be regarded as a detainer, and that the IAD is therefore inapplicable to the instant case. Appellant's contention is thus rejected.[3]

## II

Appellant argues that the trial court erred in admitting evidence of his voluntary payment of restitution to the burglary victims. This evidence was introduced through the testimony of appellant's first attorney, who told the jury that appellant had given him an initial estimate of the value of the stolen goods after communicating with the victims, and that at appellant's request, he had delivered to the victims approximately $850 in money orders received from appellant.[4] Appellant maintains that admission of this testimony violated the well settled rule that pretrial conversations, actions, or negotiations purporting to effect a compromise or settlement are inadmissible at trial. *See Farnum v. Colbert,* D.C.App., 293 A.2d 279 (1972);

---

**2.** In *United States v. Chico,* 558 F.2d 1047 (2d Cir. 1977), the Second Circuit considered dispositive the brevity of intrusion into a transferee's institutional life. The court limited its earlier opinion in *United States v. Mauro,* 544 F.2d 588 (2d Cir. 1976), *reversed,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), and held that the IAD did not apply under circumstances in which prisoners were removed from a Connecticut state prison for a few hours, by virtue of a federal writ of habeas corpus ad prosequendum, to be arraigned, pleaded, and sentenced in the federal district court of the state. The court observed that this did not interrupt the prisoners' continuous physical presence or rehabilitative programs in the sending state: "They were merely removed for a few hours at a time and immediately returned. For purposes of the Act, the situation is the same as if they had remained continuously in state prisons." *United States v. Chico, supra* at 1049 (citations omitted).

**3.** Appellant also asserts that he was inexplicably transferred on December 29, 1976 from Lorton to the Prince George's County jail. This is entirely irrelevant to prosecution in the District of Columbia. The only possible impact of

this transfer, on which the instant record casts doubt, would be on proceedings in Maryland courts.

**4.** Appellant argues that the trial court erred in permitting his first attorney to testify, because this testimony violated the attorney-client privilege. The government replies that appellant waived any privilege in connection with his attorney's payment of restitution when he testified at a pretrial hearing with respect to his payment of restitution and his attorney's role in that payment. The government is correct. The privilege which attaches to a confidential communication between attorney and client is waived when the substance of that communication is related by the client to a nonprivileged third party. McCormick, Evidence § 93 at 194 (2d ed. 1972). Moreover, the facts of the instant case compel the inference that the communication in question was never intended to be confidential. Appellant retained his first attorney to reveal the restitution plan to the victims, who are, of course, nonprivileged third parties.

Fed.R.Evid. 408. Appellant says that this rule, rooted in the policy of encouraging out-of-court resolution of disputes, finds expression in criminal law in the proscription against admission of plea bargaining negotiations. *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927).

■ Appellant's contention is patently frivolous. McCormick observes that "[a]n offer by the accused to pay money to 'buy off' the prosecuting witness and stifle prosecution . . . is not within the policy of encouraging compromises, and hence is not usually regarded as privileged." McCormick, Evidence § 274 at 665 (2d ed. 1972); *see also* 4 Wigmore, Evidence § 1061(d)(8) (Chadbourne rev. 1972). Indeed, evidence of restitution, like that of other post-crime conduct such as flight, concealment, or intimidation of a witness, is ordinarily admissible as relevant to and probative of consciousness of guilt. *E. g., Beck v. United States,* 78 U.S.App.D.C. 10, 140 F.2d 169 (1943). Moreover, such behavior may, in a criminal case, be regarded as an admission by conduct. *See, e. g., People v. Dayani,* 16 Ill.App.3d 615, 306 N.E.2d 488 (1973); *Commonwealth v. Melnyczenko,* 238 Pa.Super. 203, 358 A.2d 98 (1976).

Finally, the record does not support appellant's attempt to characterize the restitution made here as having been part of a plea bargain. There was absolutely no government involvement in the repayment.[5] We reject appellant's contention.

## III

■ Appellant argues that the trial court erred in refusing to compel the presence at trial of two defense alibi witnesses, and in refusing to grant a continuance to enable appellant to procure their attendance. Appellant further assigns error to the trial court's denial of his motion for a new trial based on the failure of these witnesses to appear.

At the close of the first day of trial, the trial court directed that on the following day all witnesses "be present unless your counsel tells you otherwise." When the witnesses in question failed to appear on the following day, appellant requested that the trial court compel their attendance by use of the contempt power. The trial court refused, holding that because the witnesses were voluntary and had not been subpoenaed or placed under oath, their nonappearance was not in contempt of court.

Appellant argues that the trial court misconstrued the nature of its directive at the close of the first day's proceedings. He says that the court had, in fact, mandated the witnesses' appearance in unambiguous terms, and that attachment for the procurement of these witnesses should have been issued under Super.Ct.Cr.R. 42(b).[6] We disagree. The exercise of the contempt power is particularly within the discretion of the trial court, and we hold that the trial court did not abuse this discretion by refusing to

---

5. Appellant also contends that the trial court refused to permit defense counsel to ask the complaining witnesses whether appellant had ever expressly admitted his guilt to them in the course of making restitution. The record reflects the frivolity of this contention. Two witnesses were asked such a question and replied in the negative. Appellant bypassed the opportunity to cross-examine a third witness in this connection.

6. That rule provides:
DISPOSITION UPON NOTICE AND HEARING. A criminal contempt except as provided in paragraph (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney, of the Corporation Counsel, or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to be released on conditions or detained as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

impose the sanction of contempt for the nonappearance of witnesses who were under no binding obligation to be present.

Appellant next contends that in any event, the trial court erred in denying his motion for a continuance. He asserts that his requested extension would have added little duration to the trial, and would have permitted him to produce two additional witnesses to corroborate his alibi.

■ Our review of the denial of a motion for continuance is limited to an examination of whether the trial court abused its discretion. *Pollen v. United States,* D.C. App., 207 A.2d 114, 115 (1965); *Stagecrafters Club Inc. v. District of Columbia,* D.C. Mun.App., 89 A.2d 876, 880 (1952); *Slaughter v. United States,* D.C.Mun.App., 60 A.2d 700, 702 (1948). In *Pollen v. United States, supra,* on facts almost identical to those presented here, we upheld the denial of a continuance which had been requested at the close of all testimony for the stated purpose of obtaining additional alibi witnesses. We observed that the trial court's discretion was not abused where there was no showing that the alleged testimony would have been more than cumulative. *See United States v. Reed,* 155 U.S.App. D.C. 198, 476 F.2d 1145 (1973). In *Slaughter v. United States, supra,* we similarly upheld denial of a motion for continuance, and observed:

> In such a case the defendant must inform the court as to what the expected testimony of the missing witnesses would be. Likewise, he must show that there is a probability that the absent witnesses would be available if the case were continued. . . . [He must also show] a "strong probability" or any probability, that the absence of the witnesses substantially affected the result of the trial or that the result would have been different if they had been located and produced. [*Id.* at 702 (citations omitted).]

■ The instant record reveals little from which we can infer that the testimony of these two alibi witnesses would have added to the prior testimony of appellant's other alibi witnesses. In moving for the continuance, appellant failed to proffer the testimony expected of one of the witnesses, and with respect to the other, appellant conceded that this witness would do no more than corroborate prior testimony that on the morning in question, appellant had gone with the first witness to the machine shop owned by the second witness. Appellant demonstrated no probability that he could produce these witnesses if a continuance were granted. The strength of the evidence against appellant precludes him from sustaining his burden of showing that their testimony would have affected the result of this trial. We accordingly find no abuse of discretion.

■ Appellant contends, finally, that the trial court erred in not granting his motion for a new trial on the basis of the nonappearance of the two alibi witnesses. To sustain this contention, appellant must show exceptional circumstances; he must demonstrate that acquittal necessarily would have followed from the testimony of these witnesses. *Huggins v. United States,* D.C.App., 333 A.2d 385 (1975); *Williams v. United States,* D.C.App., 295 A.2d 503 (1972). We have noted the likely cumulative nature of this missing testimony and the strength of evidence against appellant. We conclude appellant's motion for a new trial was properly denied. His conviction is

*Affirmed.*