Stanley M. VANCE, Appellant,

v.

UNITED STATES, Appellee.

No. 12268.

District of Columbia Court of Appeals.

Argued May 4, 1978.

Decided Feb. 27, 1979.

Richard A. Stanley, Washington, D. C., appointed by this court, for appellant.

John R. Fisher, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry, Peter E. George and Paul N. Murphy, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before GALLAGHER, YEAGLEY and MACK, Associate Judges.

GALLAGHER, Associate Judge:

A jury found appellant Vance guilty of three counts of armed robbery (D.C.Code 1973, §§ 22–2901, –3202) and four counts of assault with a dangerous weapon (D.C.Code 1973, § 22–502). He was sentenced to a term of imprisonment of five to fifteen years on each of the armed robbery counts and one to three years on each of the counts of assault with a dangerous weapon—all to run concurrently. He claims error principally on two grounds: (1) the denial of his motion to dismiss the indictment pursuant to the Interstate Agreement on Detainers (IAD);[1] and (2) the denial of his motion to suppress certain items of evidence seized pursuant to a warrantless search of the apartment in which he was arrested. We affirm.

## THE MOTION TO DISMISS

Appellant was arrested on January 12, 1976 for the offenses of which he was convicted in this case. A grand jury returned an indictment against Mr. Vance for those offenses, *inter alia*, and it was filed April 20, 1976. Arraignment on those charges in Superior Court was scheduled for April 28, but appellant did not appear. On that same day the court issued a bench warrant for his arrest. He never appeared before the Superior Court pursuant to the bench warrant, but, meanwhile, on August 5, 1976, he was convicted in the Circuit Court for Montgomery County, Maryland, of armed robbery and the use of a handgun in the commission of a felony. Mr. Vance then remained in custody in Maryland pending sentencing.

The Maryland sentence having yet to be imposed, appellant was brought to Superior Court in the District of Columbia (D.C.) on August 31, 1976, for arraignment pursuant to a writ of habeas corpus *ad prosequen-*

dum. He remained in custody in D.C. until November 8, 1976, when he was returned to Montgomery County for sentencing. That court sentenced him to a term of imprisonment of twelve years. On that same day, appellant was returned to D.C. where he remained confined pending trial.

On January 5, 1977, appellant filed a motion to dismiss the indictment for failure to comply with the IAD and a motion to suppress evidence. The motion to dismiss was denied without hearing in an order issued January 6. On April 25, 1977, a hearing on the motion to suppress was held. At this time, Mr. Vance was represented by new counsel, who renewed the motion to dismiss pursuant to the IAD. This latter motion was again denied. In denying the motion, the court told appellant's trial counsel that "I will make a statement, a full statement, to the record as to why I am denying it. And I will make it, certainly early during the course of the proceedings of the trial here, after I take a look at the motion to suppress in the case, but I am denying it." The record on appeal does not reveal any subsequent statement of rationale for the denial. In any event, appellant's trial began shortly thereafter—on April 28, 1977.

Appellant argues that two independent provisions of the IAD—both Article IV(c) and (e)—were violated here and consequently require the dismissal of the indictment against him. Article IV(c) requires a prisoner who is transferred pursuant to the IAD to be tried in the receiving state within 120 days after his transfer from the sending state. Appellant asserts that D.C. is the receiving state to which he was transferred on August 31, 1976, and that because trial did not commence until April 28, 1977 —more than 120 days later—dismissal of the indictment is required by the mandatory language of the IAD.[2] Vance also con-

1. The Interstate Agreement on Detainers Act of December 9, 1970, Pub.L.No. 91–538, 84 Stat. 1397, was adopted by Congress on behalf of the United States and the District of Columbia. The text of the Agreement is published in 18 U.S.C. Appendix and in D.C.Code 1973, §§ 24–701–705.

2. Article IV(c) provides that:
 In respect of any proceeding made possible by this article, trial *shall* be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any nec-

tends that the indictment must be dismissed because he was returned to his original place of imprisonment before trial was held in D.C., in violation of Article IV(e).[3]

The government's response is that the IAD does not apply here for two reasons: (1) because appellant was transferred pursuant to a writ of habeas corpus *ad prosequendum* and no detainer was ever filed; and (2) because appellant had not yet begun serving a term of imprisonment prior to his transfer. We agree with the government's first argument and consequently do not reach the second.

As the Circuit Court of Appeals for the District of Columbia recently commented:

> The IAD is designed to establish a uniform process for transporting prisoners for trial from a jurisdiction in which they are serving a sentence to a jurisdiction in which they have been charged with an offense. The primary purpose of the IAD is to eliminate the abuses, such as delay in bringing prisoners to trial and interference with rehabilitation programs, which characterized the use of "detainers" previous to the adoption of the Agreement.

*United States v. Cogdell*, 190 U.S.App.D.C. 185, 190–91, 585 F.2d 1130, 1135–36 (1978) (footnote omitted). Appellant relies on Article IV, which, together with Article V, provides the method by which a party to the IAD (the receiving state) can obtain custody of a prisoner from another party to the IAD (the sending state). Article IV(a) provides that:

> The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall

be entitled to have a prisoner *against whom he has lodged a detainer* and who is serving a term of imprisonment in any party State made available in accordance with article V(a) [4] hereof *upon presentation of a written request* for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated. . . . [Emphasis added.]

The United States, however, never filed a detainer against Vance in Maryland. His transfer was secured *solely* by means of a writ of habeas corpus *ad prosequendum.* As the Supreme Court said in *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 1847, 56 L.Ed.2d 329 (1978):

> When the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum*, the problems that the Agreement [IAD] seeks to eliminate do not arise; accordingly the Government is in no sense circumventing the Agreement by means of the writ. We therefore conclude that a writ of habeas corpus *ad prosequendum* is not a detainer for purposes of the Agreement. [Footnote omitted.]

The Supreme Court then continued by holding the IAD not applicable on the facts of the case because no detainer had ever been filed by the government—only a writ of habeas corpus *ad prosequendum* was used. *Id.* For the same reasons, we, too, hold the IAD not applicable to Vance's transfer on August 31. *United States v. Palmer*, D.C. App., 393 A.2d 143 (1978); *Gale v. United States*, D.C.App., 391 A.2d 230 (1978). *See United States v. Cogdell*, 190 U.S.App.D.C. at 191, *supra*, 585 F.2d at 1136.

essary or reasonable continuance. [Emphasis added.]

3. Article IV(e) provides that:
 If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

Article V(e) provides: "At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending State."

4. Article V(a) sets forth the appropriate, and mandatory, action to be taken by the sending state once a proper request for transfer has been made.

Appellant was also returned to Maryland briefly on November 8, 1976 before being returned to D.C. where he remained confined pending trial. The U. S. Marshal's Service took Vance to Maryland for only a few hours, to be sentenced, and then brought him back—apparently without ever transferring custody of him to Maryland officials. After his sentence was imposed, there was never a request—either by detainer or by writ of habeas corpus *ad prosequendum*—to transfer him back to D.C. Again, because no detainer was ever filed pertaining to this trip from Maryland to D.C., we hold that the IAD does not apply. *See United States v. Mauro, supra; United States v. Cogdell, supra.*

■ Consequently, the IAD does not apply to Vance's movements on either August 31 or November 8, nor would any of the salutary purposes of the IAD be served by applying it to either situation. We affirm the trial court's dismissal of Vance's motion to dismiss the indictment on the basis of Article IV(c) or (e) of the IAD.

## THE MOTION TO SUPPRESS

Appellant moved to suppress all items of tangible evidence seized from apartment 407, 1350 Clifton Street, Northwest—the place where he was arrested. In this motion he challenged the legality of the entry into the apartment, his arrest, and the search and seizure following the arrest. The government opposed the motion on the grounds that the warrantless entry, arrest, and search were justified by the existence of exigent circumstances and that the items were validly seized because they were either within appellant's reach or control, or in plain view.

A suppression hearing followed, at the close of which the trial court ruled for the government. The court's ruling is as follows: "Insofar as the motions are concerned, I will deny [them]. I accept the exigent circumstances doctrine. I am satis-fied there was sufficient, more-than-ample probable cause to go up there. I am satisfied that their actions were reasonable." The court did not make any explicit factual findings to aid in review of its legal conclusion.

Appellant argues that the court erred in its ruling on the motion to suppress, but only as to one issue: the post-arrest search and seizure. He contends that the warrantless search was not justified by exigent circumstances nor by any other exception to the warrant requirement. The government responds that the police were justified in entering the bedroom of the apartment in order to conduct a protective search. Then, once the police were lawfully in that bedroom, the seizure of the evidence was justified by the plain view doctrine.

In reviewing Vance's claim of error, we must afford the government "all legitimate inferences from the testimony and uncontroverted facts of record." *Jenkins v. United States*, D.C.App., 284 A.2d 460, 462 (1971). Furthermore, "[i]n the absence of express findings . . . [we must] determine if the denial of the motion to suppress is supportable under any reasonable view of the evidence." *Brooks v. United States*, D.C.App., 367 A.2d 1297, 1304 (1976); *Scarbeck v. United States*, 115 U.S. App.D.C. 135, 151, 317 F.2d 546, 562, *cert. denied*, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963). Accordingly, we review the evidence adduced at the suppression hearing.

The government presented only one witness at the hearing: Sergeant Croghan testified that on January 12, 1976, he monitored a radio broadcast for an attempted robbery of a liquor store at 801 V Street, Northwest. According to the broadcast, the owner of the liquor store saw entering his store two or three persons,[5] one of whom had what appeared to be a gun under his coat. The owner reached for a gun under his counter, and the suspects ran out

---

5. The officer did not indicate how many were mentioned. In describing the second broadcast of a robbery, see *infra*, he said, "There were also two subjects in this." The only reasonable inference from that statement is that he only remembered two suspects being noted in the first broadcast. But see *infra*.

of the store. A witness outside the store saw them leave and enter a 1968 white Oldsmobile with D.C. license plates' numbers 341–071. Sergeant Croghan then began cruising the area to look for that car. Shortly thereafter, he monitored another broadcast—this time for a robbery of a liquor store in the 2200 block of Georgia Avenue. The broadcast contained a description of clothing and of the two suspects that "very closely matched that of the first attempted robbery." The description also noted that one suspect was armed with a .45 caliber automatic and the other with a sawed-off shotgun. Upon learning from still another broadcast that the suspects' car had been located in a parking lot at the rear of 1350 Clifton Street, he went to that address and started looking for the owner of the car or its recent occupants. After checking out a lead on the third floor of the apartment building at 1350 Clifton Street, he discovered that a female had been attempting to get some clothing out of the suspects' car and had told other officers that the male former occupants of the car were in apartment 407 at 1350 Clifton Street.

Sergeant Croghan walked up the staircase and, just as he reached the door, appellant's codefendant Davis was coming out. Upon seeing the police uniform of Sergeant Croghan, Mr. Davis shouted, "Police!" and ran back into the apartment. Before the door could swing shut, Sergeant Croghan stopped it with his foot and observed Mr. Davis crossing the living room toward a couch at the far end. On the couch was a coat which matched the description of the coat which one of the suspects in the robbery had been wearing. Seeing a pistol butt protruding from the coat pocket, Sergeant Croghan ordered Mr. Davis to stop and lie down on the living room floor. As Mr. Davis did so, appellant Vance came running up the hallway of the apartment with an army-green raincoat bundled in his hands. Sergeant Croghan immediately recalled that one of the suspects in the rob-

bery had been wearing an army-green raincoat—the suspect who also had been carrying the sawed-off shotgun. When Mr. Vance saw the officer, he turned, ran back down the hallway, and dived inside the door to the rear bedroom. Sergeant Croghan ordered appellant to come out and lie down on the living room floor with Mr. Davis. He complied.

Sergeant Croghan then waited a couple of minutes until assistance arrived and the two suspects were handcuffed.. About six to ten other officers arrived at the apartment, at least some of whom entered the living room, where the suspects were being held. After their "neutralization" of the suspects—about ten minutes after his initial entry of the apartment—Sergeant Croghan went back to the bedroom into which appellant had jumped earlier. There, he saw the army-green raincoat, a sawed-off shotgun, a shotgun shell, and a cloth money bag—lying beside each other on the bedroom floor partially under the bed.[6] He did not, however, seize any of those items.

Sergeant Croghan testified that along with the other officers a crime scene search officer, Officer Arbogast, arrived. The court did not permit Sergeant Croghan to testify to any of Officer Arbogast's activities, and the government did not call him as a witness. Consequently, the circumstances of the seizure of evidentiary items by Officer Arbogast were not presented at the suppression hearing.

The government argues that the police were justified in entering the bedroom as part of a protective search in a hot pursuit situation, much like the situations in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and *United States v. Miller*, 145 U.S.App.D.C. 312, 449 F.2d 974 (1970). Then, once the police were lawfully in the bedroom, their subsequent search and seizure of the various items of evidence was justified under the plain view doctrine of *Harris v. United States*, 390 U.S. 234, 236,

---

6. At least that is where all the items except the money bag were seen, but he did not specify where the latter was.

88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). In *Warden v. Hayden, supra,* the police received information that a robbery had just occurred and that the suspect had entered a specified house just five minutes before they arrived there. Having been admitted by a woman who answered the door, they immediately fanned out to search for the suspect on all three floors of the house. Having information that the suspect was armed, the police searched for both the suspect and weapons. The police found a man (Hayden) in an upstairs room, but did not arrest him until the other officers on the first floor and in the basement reported that no other man was in the house. During this search the police found several items of evidence which were seized "prior to or immediately contemporaneous with Hayden's arrest . . . ." *Id.* at 299, 87 S.Ct. at 1646. The Supreme Court upheld the search and seizure as reasonable under the Fourth Amendment, because " 'the exigencies of the situation made that course imperative.' *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 [1948]." *Warden, supra,* 387 U.S. at 298, 87 S.Ct. 1642. The Court specifically said:

> They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

*Id.* at 298–99, 87 S.Ct. at 1646.

Since *Warden,* courts have upheld warrantless searches and seizures under a similar rationale—the need for a protective search incident to a hot pursuit situation. *E. g., United States v. Peterson,* 173 U.S. App.D.C. 49, 53, 522 F.2d 661, 665 (1975);

*United States v. Miller, supra,* 145 U.S.App. D.C. at 315, 449 F.2d at 977; *McGeehan v. Wainwright,* 526 F.2d 397, 400 (5th Cir. 1976); *Hopkins v. Alabama,* 524 F.2d 473, 475 (5th Cir. 1975). In *Miller, supra,* upon which the prosecution principally relies— along with *Warden*—the police were searching for a single, armed suspect who they had reason to believe had entered a dentist's office. After an initial refusal to police demands for admittance, the suspect opened the door. He substantially matched the suspect's description, and the police questioned him, but did not immediately arrest him. When more police arrived, some of them searched the other rooms of the dentist's office—finding a bottle of Scotch in a brown paper bag (an item stolen from the liquor store robbery which the police were investigating) and a young woman, who was later identified as the suspect's sister. The court held the seizure of the bottle lawful, because:

> They had entered the suite of offices in hot pursuit of an armed and fleeing felon. Although the man they sought was in view from the moment the door was opened, they had no way of knowing who else might be on the premises. In these circumstances, the police could justifiably conduct a search of the suite to assure themselves that no hostile and possibly dangerous persons were hiding in the other rooms. *Warden v. Hayden,* 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 . . . (1967). The bottle of whisky itself was in plain view in the dentist's laboratory, and there is no evidence in this record that the police engaged in any general search of the premises beyond that necessary to find any other persons who might have been in the suite.

*Miller, supra,* 145 U.S.App.D.C. at 315–16, 449 F.2d at 977–78 (footnotes omitted).

 Under *Warden* and *Miller,* the police action here appears as a valid protective search. The warrantless entry and arrest of appellant was justified under exigent circumstances and that ruling is not challenged. Rather, appellant claims the exigent circumstances ended with the arrest of

his codefendant and himself. Although in *Miller* the suspect had not been arrested at the time the protective search was conducted, the import of its holding was that a protective search may be conducted in hot pursuit situations even though the single suspect has been located. Appellant does not contend that this was not a hot pursuit situation. Furthermore, on cross-examination Sergeant Croghan stated that one of the radio broadcasts mentioned three suspects. Since only two had been arrested in the apartment at the time of the bedroom search, it would be entirely reasonable for the police to believe their safety was potentially endangered by the presence of a third suspect,[7] armed perhaps with the sawed-off shotgun, hiding in the apartment. Even if there had not been mention of a third suspect, the police could have engaged in the precaution of ascertaining whether some other person was still lurking in a back room with the as yet undiscovered sawed-off shotgun.

The final question is whether Sergeant Croghan believed that his safety and the safety of other officers was endangered by the possible presence of another person in the bedroom when he entered it. There is no conclusive evidence in the record of the suppression hearing to determine why he entered that room.[8] Appellant stresses the following colloquy as determinative. Codefendant Davis' trial counsel asked, "Before these officers arrived, though, there was no one in the apartment besides you, did you testify? You, Stanley Vance, and Anthony Davis?" Sergeant Croghan responded, "As far as I know, that's all that was in the apartment, yes."

Again looking to *Warden*, we find there that one of the police officers had searched a washing machine and found some clothing which was later introduced into evidence against Hayden. Hayden argued that "the officer who seized the clothing was searching neither for the suspect nor for weapons when he looked into the washing machine in which he found the clothing." 387 U.S. at 299, 87 S.Ct. at 1646. The Supreme Court rejected this argument stating:

> [I]t cannot be said on this record that the officer who found the clothes in the washing machine was not searching for weapons. He testified that he was searching for the man or the money, but his failure to state explicitly that he was searching for weapons, in the absence of a specific question to that effect can hardly be accorded controlling weight. He knew that the robber was armed and he did not know that some weapons had been found at the time he opened the machine. In these circumstances the inference that he was in fact also looking for weapons is fully justified.

*Id.* at 299–300, 87 S.Ct. at 1646 (footnote omitted). In Vance's case no specific question was asked as to Sergeant Croghan's purpose in entering the bedroom and his failure to state explicitly that he entered that room to conduct a protective search is not entitled to controlling weight. He knew that a third suspect had been noted in the broadcast and he knew that the sawed-off shotgun had not yet been seized. Consequently, we consider fully justified the inference that Sergeant Croghan was lawfully in the bedroom for the purpose of conducting a protective search.

Once lawfully in that bedroom, the evidence in question was only partially under the bed. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States, supra*, 390 U.S. at 236, 88 S.Ct. at 993. The Supreme Court in *Cool-*

---

7. Although Sergeant Croghan's initial testimony indicated that both radio broadcasts noted two suspects, on cross-examination by appellant's trial counsel, Sergeant Croghan recalled that the lookout for the Georgia Avenue robbery was for three suspects.

8. The motivation or primary purpose of the arresting officer in so doing is essentially a question of fact to be resolved by the trial court. *Rippy v. United States*, D.C.App., 322 A.2d 276, 279 (1974). The same principle holds true for the searching officer's purpose in conducting a search.

*idge v. New Hampshire*, 403 U.S. 443, 466–71, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), set forth three requirements for the plain view exception: (1) the presence of the police at the situs of the search and seizure must be lawful; (2) the discovery of the evidence must be inadvertent; and (3) the items seized must be immediately recognizable as evidence.

The next question remaining is whether his discovery of the evidence was inadvertent. This question

> turns upon the motivation of the officers in the activities which unearthed the disputed evidence. If the discovery were expected and constituted the principal purpose of the intrusion, in the absence of an adequate reason why a warrant could not have been obtained, the plain view exception is inapplicable. Satisfaction of the inadvertency criterion would require the discovery of the [challenged evidence] to have been a subordinate aspect of the arrest itself, or the result of some justifying purpose other than merely gathering evidence.

*Brooks v. United States*, D.C.App., 367 A.2d 1297, 1306–07 (1976) (footnotes omitted). We have already concluded that Sergeant Croghan was lawfully in the bedroom because he was conducting a protective search. This demonstrates that he was not "merely gathering evidence." *Id.* at 1307 & n.17. Having noticed the items of evidence—especially the sawed-off shotgun and green raincoat—on the floor which were only partially concealed under the bed, it was permissible to seize them. Unquestionably, those items were immediately recognizable to the officer. Consequently, we conclude the evidence discovered and seized fell within the scope of the plain view exception.

The conviction appealed from is

*Affirmed.*