Julian Anthony RUTH, Appellant,

v.

UNITED STATES, Appellee.

James E. MATTHEWS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 13846, 79–275.

District of Columbia Court of Appeals.

Argued March 11, 1980.

Decided Nov. 12, 1981.

W. Anthony Fitch, Public Defender Service, with whom Silas J. Wasserstrom, Public Defender Service, Washington, D.C., was on the briefs, for appellant Ruth.

Jean D. O'Malley, appointed by this Court, Washington, for appellant Matthews.

Benjamin B. Sendor, Asst. U. S. Atty. with whom Charles F. C. Ruff, U. S. Atty. and John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, MACK, Associate Judge, and GALLAGHER, Associate Judge, Retired.[1]

NEWMAN, Chief Judge:

Appellants were convicted after trial by jury of felony murder, two counts of armed robbery, assault with intent to kill while armed, and other lesser crimes.[2] On

---

1. Judge Gallagher was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.

2. Both appellants were also convicted of altering identifying marks on a weapon. D.C. Code 1973, § 22–3212. In addition appellant Matthews was found guilty of carrying a pistol without a license, and appellant Ruth was con-

appeal, both appellants contend that the trial court erred in admitting into evidence various items seized from appellant Ruth's room; that the court improperly limited cross-examination of government witnesses; and that the court erred in failing to dismiss the felony murder count as duplicitous.[3] Finding no error, we affirm.

## I

Testimony at trial indicated that at about 6:00 a.m. on October 3, 1977, Ella Paige walked with a friend and her dog to a service station on 14th Street to buy a soft drink. On her way home, approaching 1732 14th Street, she heard someone pleading for help. As she looked up she saw a man, later identified as James McCoy, one of the victims, leaning out of a window. McCoy fell to the pavement and crawled into the street. Paige then saw two men, later identified as appellants Ruth and Matthews, come out of the building and drag McCoy back onto the sidewalk. Paige further testified that she saw Ruth and Matthews beat McCoy repeatedly and saw Matthews strike him with a pistol.

Immediately after observing the incident Paige ran to a nearby restaurant and telephoned the police. Sergeant Allen Smith of the Metropolitan Police Department arrived on the scene first, with other officers quickly following. One of the officers, Detective Leroy Harris, found Michael Gaile inside the building, unconscious with a bullet hole in his chest. Sergeant Smith and Sergeant Willie Streeter proceeded with Paige to a nearby service station. After Paige explained what she had observed, Jimmy Speight, a station attendant, stated that he knew Ruth and Matthews and told the officers that they had just run past the station. Speight gave the officers Ruth's address, and the officers and Paige proceeded to drive there.

As the officers approached Ruth's house, Sergeant Streeter noticed a light on the second floor. In the illuminated room, he saw Ruth putting something behind the dresser. He also saw another person in the room who appeared to be a woman wearing a blue bathrobe. The officers knocked on the front door, and as Ruth's uncle, Joseph Ruth, opened the door, Sergeant Streeter saw appellant Ruth near the door. Sergeant Streeter took him outside for a show-up. Sergeant Streeter also saw Matthews in a nearby room and subsequently took him outside for a show-up. Paige immediately identified Ruth and Matthews as the assailants, and they were arrested.

After the show-up, Sergeants Streeter and Smith and Ruth's uncle went to the second floor room where Sergeant Streeter had previously seen appellant Ruth and a woman. Sergeant Streeter testified at the suppression hearing that Ruth's uncle had given the officers permission to go upstairs. He further indicated that his purpose in going upstairs was to conduct a limited investigation, as he had seen a woman in the room with Ruth, and as he knew that appellants had been armed. While in the bedroom, the officers seized various items, including a pair of blood-stained socks, a plastic bag of the type to hold marijuana, a brown paper bag, a ten dollar bill, and a

victed for carrying a dangerous weapon. *Id.* § 22–3204.

Appellant Matthews argues that the trial court erred in permitting the government to reopen its case and present evidence as to whether he possessed a license for a gun. The government had failed to present evidence that Matthews lacked a license to carry a pistol during its case-in-chief. We find no merit in this contention. *See Morgan v. United States,* 111 U.S.App.D.C. 127, 129, 294 F.2d 911, 913 (1961), *cert. denied,* 368 U.S. 978, 82 S.Ct. 482, 7 L.Ed.2d 439 (1962); *United States v. Powers,* 572 F.2d 146, 152–53 (8th Cir. 1978); *United States v. Powers,* 572 F.2d 146, 152–53 (8th Cir.

1978); *United States v. Ard,* 544 F.2d 225, 226–27 (5th Cir. 1976).

3. Appellant Ruth also urges that the trial court erred in denying his motion for a continuance. We reject this claim. *See O'Connor v. United States,* D.C.App., 399 A.2d 21, 26–28 (1979); *Holt v. United States,* D.C.App., 381 A.2d 1388, 1391 (1978); *United States v. Haldeman,* 181 U.S.App.D.C. 254, 306, 559 F.2d 31, 83 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). *See also Gale v. United States,* D.C.App., 391 A.2d 230, 236 (1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979).

pair of shoes with blood stains on them. Sergeant Streeter testified that Ruth's uncle found a bag of blood-stained money behind a dresser—the same dresser behind which Sergeant Streeter had seen Ruth put something earlier.

Later the same morning, Detective Harris and Officer Charles E. Bailey returned to Ruth's House with a search warrant and recovered a revolver from the freezer in the kitchen, a blood-stained pillow case from a sink in the second floor bathroom, and a pair of tan trousers, a tan overcoat, and a blue jacket from Ruth's room. Subsequent analysis of the blood on several items seized during the two searches of the room revealed blood types which matched the blood types of McCoy and Gaile.

Gaile recovered after being hospitalized for approximately five weeks. McCoy died as a result of his wounds.

At trial, Gaile testified for the government and stated that after midnight on October 3, 1977, he entered a gambling parlor run by the decedent, James McCoy, on the second floor of 1732 14th Street, Northwest. McCoy and appellants were already in the parlor. All four men gambled, and appellants lost between $85 and $100 to McCoy and Gaile. Appellants then left, but returned to the parlor at about 3:30 a.m. Gaile further stated that he fell asleep at the parlor and awoke when appellant Matthews struck him in the head with a pistol and announced, "This is a stickup." He testified that appellant Ruth stabbed Gaile in the stomach with a knife and that Matthews shot him. One or both appellants kicked Gaile, breaking his jaw, and then searched his pockets, taking between $180 and $205.

## II

Appellants contend that various items were seized in violation of their Fourth Amendment rights under the Constitution. Specifically, they maintain that the search

of appellant Ruth's second floor bedroom was unlawful because there were no exigent circumstances, and because the warrant authorizing the second search was based on evidence illegally obtained during the first search.[4]

In *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), where the police received information that an armed robbery suspect had entered a house minutes before they arrived, the Supreme Court upheld a search of all three floors of the house for persons and weapons. In sustaining the officers' seizure of clothing found in a washing machine during the course of the search, the Court stated:

> They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them .... [Id. at 298–99, 87 S.Ct. at 1645–1646 (emphasis added).]

Appellants argue that since all suspects in the instant case had been arrested *prior* to the police's entry into the house, all exigencies had dissipated. They urge that *Warden* is thus inapplicable.

*United States v. Miller*, 145 U.S.App.D.C. 312, 449 F.2d 974 (1971), however, indicates that *Warden* is not restricted to such a narrow reading. In *Miller*, where police officers searching for a suspect in a dentist's office found him immediately upon entering, the court nevertheless held that "the police could justifiably conduct a search of the suite to assure themselves

---

4. We note initially that there may be a genuine issue as to whether Matthews has standing to object to items seized in Ruth's room. None of the parties have addressed this issue. Assum-

ing, without deciding, that Matthews does have standing, we nevertheless conclude that the search was lawful for the reasons discussed above.

that no hostile and possibly dangerous persons were hiding in the other rooms." *Id.* at 315, 449 F.2d at 977.

This court recently applied the *Ward* and *Miller* decisions in *Vance v. United States*, D.C.App., 399 A.2d 52 (1979). In *Vance*, the police received information that two of three armed robbery suspects had fled to a particular apartment building. Upon arriving there, an officer apprehended two suspects in the living room of one of the apartments . After more officers arrived and the two suspects were arrested, one of the officers returned to the bedroom and seized various items, including a sawed-off shotgun, which the first officer had seen earlier. We held that under *Warden* and *Miller* the search of the bedroom was justified as a valid protective search, even after the two suspects had been arrested: "Although in *Miller* the suspect had not been arrested at the time the protective search was conducted, the import of its holding was that a protective search may be conducted in hot pursuit situations even though the single suspect has been located." *Id.* at 58. We also noted that even if a third suspect had not been reported, "the police could have engaged in the precaution of ascertaining whether some other person was still lurking in a back room with the as yet undiscovered sawed-off shotgun." *Id.*

■ Based upon *Warden, Miller,* and *Vance,* we hold that the police officers were entitled to enter the bedroom in order to conduct a protective search for weapons and persons. The facts of this case indicate that the police apprehended the two suspects on the premises. One of the police officers had seen a woman in the second floor bedroom just minutes earlier and had seen persons attempt to hide something behind the dresser. Furthermore, the police had reports that the suspects were armed, and as of the time the officers entered the

bedroom the weapon had not yet been found.[5]

The fact that the police were legitimately on the premises, however, does not end the inquiry. The issue now is whether various items in the bedroom were lawfully seized by the police. We note that in *Warden v. Hayden, supra,* one of the police officers searched a washing machine and found some clothing which was subsequently introduced into evidence. The Supreme Court upheld that search as lawful pursuant to exigent circumstances. In the instant case, the record reveals that the police conducted a brief, limited search incident to a hot pursuit. All of the items seized were located in appellant Ruth's bedroom, all items were within easy access of the officers, and no full search of the premises was conducted.[6] Under these standards, we affirm the trial court's denial of appellants' motion to suppress.

### III

■ Appellants contend that the court improperly restricted three lines of cross-examination. They argue first that the court abused its discretion by restricting cross-examination of Michael Gaile, which was intended to show that Gaile had won money in gambling activities from a number of persons other than the defendants and that these other persons may have had a motive to rob Gaile and McCoy. Specifically, the court did not permit defense counsel to ask whether Gaile had won money through gambling from people other than appellants or whether Gaile had cheated when gambling. The question of whether Gaile had made enemies with individuals other than appellants, however, has little bearing on the credibility of his identification of appellants as the assailants. As we noted in *Springer v. United States*, D.C. App., 388 A.2d 846, 855 (1978), a trial court

5. Appellants suggest that the police officers spotted the woman they had seen in the bedroom in an adjoining hall *prior* to entering the bedroom and that there was therefore no need to continue the protective search. The record, however, is not at all clear on this point. Furthermore, even if the police did notice someone in the hall, this fact did not preclude the possibility that someone else was in the room.

6. Since the first warrantless search was valid, appellants' contentions as to the second search, conducted pursuant to the warrant, also fail.

may always exercise its discretion to limit cross-examination "to prevent inquiry into matters having little relevance or probative value to the issues at trial. . . ." *See also Brown v. United States,* D.C.App., 409 A.2d 1093, 1099–1100 (1979); *Mitchell v. United States,* D.C.App., 408 A.2d 1213, 1214 (1979).

Moreover, the record shows that the trial court in fact gave defense counsel considerable leeway to explore the collateral issue of Gail's gambling activities before restricting such questioning. Specifically, the court permitted defense counsel to show through cross-examination that Gaile was a professional gambler who sometimes assisted McCoy in his gambling parlor. In addition, defense counsel was allowed to demonstrate that Gaile had gambled daily for the past three years and that gambling was his major source of income.

■ Appellants secondly contend that the lower court erred in prohibiting defense counsel *in limine* from inquiring whether Gaile, an alien, had a motive to favor the government due to a fear that he might be deported as a result of his illegal gambling activities. The propriety of a trial court's restriction of cross-examination depends initially upon whether the inquiry was foreclosed entirely or whether it was merely circumscribed. As we stated in *Springer v. United States, supra:*

> Where the record reflects a curtailment of a requested line of bias cross-examination *in limine,* so that the jury is unable properly to perform its fact-finding function in inferring bias from the testimony as a whole, we will assess cross-examination errors by a *per se* standard. *Alford v. United States,* [282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624] *supra; United States v. Mayer,* 556 F.2d 245, 252 n. 10 (5th Cir. 1977). *See also Hyman v. United States, supra* [D.C.App., 342 A.2d 43] at 44. If, however, the trial court has permitted some cross-examination so that the jury has sufficient information from which to infer bias (should it so choose), this court

will evaluate error by application of the harmless constitutional error test of *Chapman v. California,* [386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705] *supra.* To hold harmless such error in curtailing constitutionally-protected cross-examination, it must be clear beyond a reasonable doubt "(1) that the defendant would have been convicted without the witness' testimony or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony." Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska,* 73 Mich. L. Rev. 1465, 1473 (1975) (footnote omitted). [*Id.* at 856.]

■ Although appellants assert that the lower court cut off all questioning regarding Gaile's status as an alien, the record belies this contention. Specifically, the court permitted defense counsel through cross-examination to show that Gaile was an alien, a citizen of Jamaica. The court also permitted defense counsel to ask Gaile whether the government had promised him anything in exchange for his testimony and whether he was biased. We think that if error was committed by the trial court, it was rendered harmless by the permitted line of inquiry.[7]

### IV

Finally, appellants argue that the trial court erred in denying their motion to dismiss the felony murder count in each indictment as duplicitous and in subsequently rejecting a proposed jury instruction to cure the prejudice caused by the alleged duplicity.

■ The first count of the indictment in this case charged that:

> James E. Matthews and Julian A. Ruth, within the District of Columbia, while armed with dangerous weapons, that is a pistol and a knife, in perpetrating and attempting to perpetrate the crime of

---

**7.** We find no merit in appellants' contention concerning the trial court's limits on the cross-

examination of Ella Paige.

robbery as set forth in the second and fourth counts of this indictment, killed James A. McCoy. . . .

The second count of the indictment charged Ruth and Matthews with the armed robbery of McCoy, and the fourth count charged them with the armed robbery of Gaile. The court gave the standard jury instruction for felony murder, stating in pertinent part as follows:

The essential elements of the offense of murder in the first degree-felony murder, each of which the Government must prove beyond a reasonable doubt are, one, that the defendant inflicted an injury or injuries on the deceased from which the deceased died, and two, that the defendant did so while perpetrating or attempting to perpetrate the offense of robbery.

Duplicity is defined as "the joining in a single count of two or more distinct and separate offenses." 1 C. Wright, Federal Practice and Procedure § 142, at 306 (1969). See also Johnson v. United States, D.C. App., 398 A.2d 354, 369 (1979). Appellants now contend that the indictment was duplicitous because it allowed the jury to convict them of felony murder as the result of committing the robbery of McCoy, the robbery of Gaile, or the robbery of both.

■■■■■ Appellants' contention is incorrect for several reasons. First, in its literal terms, the felony murder count of the indictment permitted the jury to convict only upon a finding that appellant killed McCoy during the course of the robbery of both McCoy and Gaile. Thus, there was nothing in the indictment suggesting that the appellant must be guilty of only one robbery. An indictment is not duplicitous if it alleges that a defendant committed a series of related acts which together comprise a criminal transaction. United States v. Zeidman, 540 F.2d 314, 316 (7th Cir. 1976); Gerberding v. United States, 471 F.2d 55, 59 (8th Cir. 1973).

Second, the cases upon which appellants rely are inapposite. Appellants rely most heavily upon the case of Johnson v. United States, supra. In Johnson one of the counts of the indictment charged all six defendants

with assault with intent to kill. At trial, the government explained that this charge was intended to encompass two separate incidents: the act of pushing the victim part of the way out of a window, and the act of throwing her with her hands bound into the Potomac River. Subsequently, the trial judge in Johnson instructed the jury that it could find the defendants guilty of assault with intent to kill based upon either the window incident or the river episode or both. We held that the trial court erred in giving that instruction, since it would allow the jury to convict on the basis of a nonunanimous verdict by virtue of the fact that some jurors might believe one incident and not the other. In essence, in Johnson we did not address the validity of the indictment, but held that the instruction was reversible error. In the present case, however, the trial court gave no such instruction. Instead, the unambiguous indictment stood alone and merely the standard felony murder charge was given.

United States v. Gipson, 553 F.2d 453 (5th Cir. 1977), cited by appellants, is equally inapposite. In Gipson the appellate court also found that the trial court's instructions resulted in error, for they sanctioned a nonunanimous verdict. The defendant there was convicted by a jury of selling or receiving a stolen vehicle moving in interstate commerce, in violation of 18 U.S.C. § 2313 (1976). That statute prohibits the "receiving, concealing, and storing" of a stolen vehicle moving in interstate commerce, and also prohibits the "bartering, selling and disposing" of such a vehicle. The court's instructions authorized the jury to convict the defendant if it found that the defendant had performed any one of the six prohibited acts. In essence, a guilty verdict could have been returned pursuant to the court's instructions despite the fact that some jurors might have believed that Gipson engaged in conduct characterizeable as receiving, concealing, or storing, while other jurors were convinced that he committed acts constituting bartering, selling, or disposing. In the present case, however, it is clear that the jury was given no such op-

tion. Instead the indictment clearly indicated that the defendants must be guilty of both robberies.

In this case, the jury convicted appellants of both the armed robberies alleged in the felony murder indictment. Thus, we need not consider appellants' contention that the court committed reversible error in refusing to instruct the jury that it could convict on the felony murder charge only if it found (1) that appellants had perpetrated or attempted to perpetrate both robberies, and (2) that the killing of Mr. McCoy, if committed by appellants, occurred in the course of perpetrating or attempting to perpetrate the two robberies. We note, however, that such an instruction should be given in the future.

*Affirmed.*

MACK, Associate Judge, dissenting:

A fundamental precept immediately comes to mind. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance of the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980).

I fear that the majority is sanctioning conduct under the umbrella of "exigent circumstances" which does violence to the Fourth Amendment. The factual circumstances here present a strange vehicle upon which to pin the label of "hot pursuit." (Indeed the government has offered an alternative theory of "authorized consent" to justify the intrusion here).

In my view, the warrantless entry and search of appellant Ruth's bedroom was unlawful. At the time the two police sergeants (Streeter and Smith) ascended the inside stairwell to reach the second floor room, Ruth and Matthews, the only "two suspects," were under arrest and in custody outside the front of the house. At least six officers were in or around the premises— two in front of the premises and two in the rear. Inside, at the top of the stairway,

Streeter and Smith saw Ruth's grandmother, who appeared to be the same woman whom Streeter had seen from the alley in Ruth's room. The officers ignored her; they neither asked her about a weapon nor frisked her for one. The officers knew that the room was Ruth's, the door was open, the light was on and as Streeter stepped inside he immediately saw that the room was vacant. On these facts I find it difficult to conclude that this was an entry incident to "hot pursuit" or that this was the kind of "protective search," for weapons or dangerous accomplices found to be reasonable in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Vance v. United States*, D.C.App., 399 A.2d 52 (1979) or *United States v. Miller*, 145 U.S. App.D.C 312, 449 F.2d 974 (1970). It is likewise impossible for me to conclude that the items seized were in reach or control of the arrestees so as to trigger the limited exception to the warrant requirement. *See New York v. Belton*, —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In my view, the officers had no right to enter the room or to make "plain view" seizures. *Cf. Miller* and *Vance, supra*, where such seizures occurred inadvertently while the officers were lawfully conducting a protective search.

The Supreme Court only last year (in *Payton, supra*), reminded that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* 445 U.S. at 585, 100 S.Ct. at 1379 (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The court had no occasion in the circumstances of that case to consider the sort of emergency or dangerous situation amounting to "exigent circumstances." Two years prior to *Payton* however, the Court in *Mincey v. Arizona*, 437 U.S. 385, 393 , 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978), rejected the argument that the warrantless search of an apartment, where a homicide had recently occurred, was constitutionally permissible. The Court noted:

"[a] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation' and it simply cannot be contended that this search was justified by an emergency threatening life or limb." [Citing *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1962).]

Further noting that the presence of police on the scene minimized the possibility that evidence would be lost, destroyed or removed during the time required to obtain a search warrant, the Court said:

> We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search. [*Mincey v. Arizona, supra* 437 U.S. at 394, 98 S.Ct. at 2414.]

The circuit court in this jurisdiction has suggested guidelines as to what might constitute such exigent circumstances. In *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), Judge Leventhal set forth a number of *material considerations*: (1) a grave offense is involved (2) the suspect is reasonably believed to be armed (3) a clear showing of probable cause to believe the suspect committed the offense (4) strong reason to believe that the suspect is in the premises being entered and (5) a likelihood that the suspect will escape if not swiftly apprehended.

At least three of the considerations advanced by Judge Leventhal are missing here. Although the police knew that appellant Ruth (who might be armed) was on the premises at the time they initially entered the house, they knew he had been arrested and was in custody outside the premises at the time of the second entry and search of his room; they knew the suspect posed no danger as to escape, as to destruction of contraband, or as to police safety when they reentered the house and ascended to his room. This was neither an entry in hot pursuit, nor under exigent circumstances nor was this a protective search. I would hold that the motion to suppress was improperly denied as to the appellant Ruth.