Johnny Mack **STURDIVANT**, a/k/a Joe Robinson, Appellant,

v.

**UNITED STATES**, Appellee.

No. 84–522.

District of Columbia Court of Appeals.

Argued May 12, 1988.
Decided Dec. 29, 1988.

Carl V. Angelis, Washington, D.C., appointed by the court, for appellant.

Thomas J. Tourish, Jr., Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

---

Before MACK, BELSON and STEADMAN, Associate Judges.

BELSON, Associate Judge:

This case presents the question whether the warrantless search of an attic crawl space above appellant's bedroom was permissible under the exigent circumstances exception to the warrant clause of the Fourth Amendment. The trial court denied appellant's motion to suppress the evidence found in the crawl space. After a jury trial, at which that evidence was presented, appellant was convicted of one count of armed robbery, D.C.Code §§ 22–2901, –3202 (1981 & 1987 Supp.), and two counts of possession of a prohibited weapon, D.C. Code § 22–3214 (1981). Because we conclude that the immediate need to protect the officers as well as the community justified the limited search that was conducted, we affirm.

At approximately 7:37 p.m. on October 18, 1982, appellant Johnny Mack Sturdivant approached a George Washington University Law School professor in front of her house in the 200 block of 5th Street, S.E., shot her in the head with a sawed-off shotgun, and fled with her briefcase into a blue 1976 Oldsmobile that was waiting nearby. The car, driven by another man, sped away. A passerby who saw the man fleeing recorded the license plate number of the getaway car.

Within minutes, several police officers responded to the scene. A "Wales" check revealed that the car was registered to a Fletcher Stewart living at 1536 D Street, S.E. Upon learning this information, some of the officers who were on the scene, as well as others who were cruising the area looking for the car, were dispatched to that address, arriving within approximately fifteen minutes of the shooting. One officer found the blue Oldsmobile parked in back of the small rowhouse, unoccupied; he ascertained that it had been driven recently by noting its hot muffler, the water dripping from beneath it, and the fresh tire tracks made when it was driven through a puddle; he then radioed this information to three other officers who were stationed in front of the house. Expecting the suspects to be inside the house, the three officers in front knocked on the front door.

Fletcher Stewart's wife answered the door and informed the officers that her husband was not there but at work. The officers then entered the house to look for the suspects. Finding no one else on the first floor, they ascended the stairs to the second floor. Mrs. Stewart followed them upstairs. In a bedroom, the officers found codefendant, Clem Jones. In another bedroom behind that one, they found Sturdivant. The officers saw no other persons in the house.

Because Sturdivant closely matched the description of the gunman, he was taken outside for a show-up identification. Jones remained upstairs with Officer Ball, who informed him that he was investigating a shooting and advised him of his *Miranda*[1] rights. Jones continued to talk, however. He admitted that he had been driving the car. He explained that, although the car was registered to his father, Fletcher Stewart, he used it on occasion. He also stated that Sturdivant was his uncle. During this conversation, Officer Ball received word that Sturdivant had been positively identified and had been arrested. Officer Ball then placed Jones under arrest and readvised him of his *Miranda* rights. Jones again stated that he understood his rights and was willing to talk.

By this time, Officer Ball and Jones had moved to the back bedroom, where Sturdivant slept and where he had been found by the police during their search for the suspects. Because the police had discovered no weapons during that search, Officer Ball asked Jones if he knew where the gun was located, stating that it was important to get the gun out of the house. Pointing to a trap door in the ceiling of the room where they were standing, Jones replied that the gun was in the attic crawl space, but indicated that other members of the family would not come across it.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After Sturdivant was taken to police headquarters, Detective Wyzgowski and Officer Peck of the Crime Scene Search Unit, who had arrived at the house sometime earlier, stacked two pieces of furniture on top of one another to remove the trap door to the crawl space. Just inside the opening was a large brown leather briefcase and an open gym bag, the only items in the crawl space. The gym bag contained two sawed-off shotguns and a green Army field jacket. The briefcase contained books and papers belonging to the victim. Jones remained in the bedroom with the police during the search. He identified the items recovered as the articles that Sturdivant had placed in the crawl space after the robbery. The search for the suspects as well as the guns took no more than an hour.

After a hearing, the trial court denied Sturdivant's motion to suppress the physical evidence. The court noted that "the first officers arrived at the house on 'D' Street within minutes, ten to 15 minutes at most, after the actual offense was committed.... [I]t is as close to hot pursuit as can be...." After discussing the need to protect the officers and the danger of waiting while someone ran downtown to get a warrant, the court concluded that although there had been no consent to the initial entry into the house or the subsequent search for the gun, both the entry and the search met the tests of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1966), and *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc).

In challenging the trial court's decision, appellant does not dispute the legitimacy of the officers' initial entry into the house in order to effect his arrest. Nor does he argue that the officers lacked probable cause for the search of the attic crawl space. Rather, he contends, his Fourth Amendment rights were violated by the warrantless search of the attic crawl space for the gun.[2]

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). The government does not argue that the search of the attic crawl space was carried out pursuant to consent. It is not clear whether Jones in fact consented to the search, or had authority to do so. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (search conducted pursuant to consent exempt from probable cause and warrant requirements); *Derrington v. United States,* 488 A.2d 1314, 1325 (D.C. 1985) (appellant's grandmother, the lessee of the apartment, had authority to give permission for search). Nor does the government seek to justify the search as incident to appellant's arrest or that of Jones. *Cf. Chimel v. California,* 395 U.S. 752, 768, 89 S.Ct. 2034, 2043, 23 L.Ed.2d 685 (1969) (scope of a police search incident to arrest deemed unreasonable). At the time the search was initiated, appellant was in a transport car on his way to police headquarters. Although Jones was still in the room where the hatch was located, access to the crawl space was beyond "the area 'within his immediate control.'" *Chimel, supra,* 395 U.S. at 763, 89 S.Ct. at 2040. Thus, we consider whether exigent circumstances made the search for the gun valid without a warrant.

In *Hayden, supra,* the Supreme Court found that exigent circumstances allowed the police to enter and search a house without a warrant for a man who had robbed a taxicab company at gunpoint minutes before. During the search for the

---

**2.** Although the trial court expressed no separate findings concerning the search of the crawl space, we must affirm the trial court's denial of the motion to suppress if, taking the evidence in the light most favorable to the government, it is "supportable under any reasonable view of the evidence." *Brooks v. United States,* 367 A.2d 1297, 1304 (D.C.1976) (citations omitted).

suspect, the officers located two guns in a toilet flush tank and, in a washing machine, clothing that matched the articles the suspect was reported to have been wearing. The United States Supreme Court held that both the entry and the search that produced the guns and evidence were valid. The Court noted:

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that [the suspect] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

*Hayden, supra,* 387 U.S. at 298–99, 87 S.Ct. at 1646.

In *Dorman, supra,* the United States Court of Appeals for the District of Columbia Circuit upheld a warrantless, unconsented, and nonforceable entry and search of a residence for a man who had robbed a clothing store four hours earlier. During the search for the suspect, the police discovered a suit that had been stolen from the store hanging in a closet where they thought the suspect might be hiding. *Id.* 140 U.S.App.D.C. at 316, 435 F.2d at 388. Although the search took place too long after the robbery for it to be deemed in hot pursuit, *id.* at 321, 435 F.2d at 393, several underlying factors quite similar to those present in a case of hot pursuit led the court to conclude that exigent circumstances made the search reasonable. *Id.* at 320–21, 435 F.2d at 392–93. These factors have been summarized as follows:

> (1) that a grave offense is involved, particularly a crime of violence; (2) the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) a strong reason to believe that the suspect is in the dwelling; (5) the likelihood of escape if not swiftly apprehended; (6) a peaceful entry as opposed to "breaking"; and (7) the time of entry (night or day).

*United States v. Lindsay,* 165 U.S.App. D.C. 105, 110, 506 F.2d 166, 171 (1974).

In both *Hayden* and *Dorman* the search that uncovered the evidence occurred contemporaneously with the search for the suspect. In *Ruth v. United States,* 438 A.2d 1256 (D.C.1981), however, this court had occasion to consider the validity of a search for a weapon that took place after the defendant's arrest. Ruth and his accomplice were suspected of having beaten one man and shot another shortly before the police were summoned. Upon learning the identity of the suspects from a bystander who had watched them flee, the police drove immediately to Ruth's house. As the officers approached the house, they observed Ruth in a second floor bedroom with a woman in a blue bathrobe. Ruth appeared to be placing something behind the dresser. By the time the officers knocked on the door, however, Ruth had come downstairs. He and his accomplice, who was also downstairs, were taken outside and positively identified. After they were arrested, two officers went upstairs to conduct a limited search motivated by what they had earlier seen through the window and by their knowledge that the assailants had been armed. Although the item behind the dresser turned out to be a bag of blood-stained money, rather than a gun, the officers seized it, as well as other evidence lying about the room in plain view. We held in *Ruth* that the officers were justified in entering the bedroom to conduct a protective search for weapons and persons. *Id.* at 1260. They were aware that a serious offense had been committed, that the weapon had not been found, and that another person had been present when the object thought to be the gun was hidden behind the dresser. *Cf. Vance v. United States,* 399 A.2d 52 (D.C.1979) (search of apartment permissible *after* the two suspects had been arrested to ensure that no other hostile person remained who had access to the yet undiscovered shotgun); *United States v. Miller,* 145 U.S.App.D.C. 312, 449 F.2d 974 (1971) (search of a dentist's office after suspect was apprehended justified by need to find any other persons who might have been there). We also held

that the bloodstained money and other items were lawfully seized, noting that "the police conducted a brief, limited search incident to a hot pursuit. All of the items seized were located in appellant Ruth's bedroom, all items were within easy access of the officers, and no full search of the premises was conducted." *Ruth, supra,* 438 A.2d at 1260 (footnote omitted).

Sturdivant points out that in this case, unlike *Hayden* and *Dorman,* the search for the gun was conducted after he and Jones had been arrested and he had been transported to headquarters. He attempts to distinguish this case from *Ruth,* as well, because the only other person in the house, Mrs. Stewart, had already been located. Thus, he argues, any exigency that existed at the time the officers entered the house had dissipated by the time the officers decided to search the crawl space. In addition, he maintains, the police could not have feared that the gun might be removed, misused, or destroyed since Jones had assured them that no one in the household would come across it. We are unpersuaded by his efforts to distinguish *Ruth.*

To determine whether exigent circumstances existed, we examine "the facts perceived by the police at the time of ... the initiation of the search." *Gant v. United States,* 518 A.2d 103, 107 (D.C.1986). At the time the police commenced the search, they knew that a sawed-off shotgun had been used in a serious crime and that it had not been retrieved. We have observed that the presence of such weapons creates a special exigency because of their potential threat to human life. *See Derrington, supra,* 488 A.2d at 1324 (citing *United States v. Allison,* 205 U.S.App.D.C. 270, 272, 639 F.2d 792, 794 (1980); *United States v. Hendrix,* 194 U.S.App.D.C. 76, 79, 595 F.2d 883, 886 (1979)); *Gaulmon v. United States,* 465 A.2d 847, 851 (D.C.1983) ("threat of harm to both police and public"); *In re F.D.P.,* 352 A.2d 378, 383 (D.C.1976) ("possibility of harm to the public at large if the gun fell into 'untrained or perhaps malicious hands' "); *see also United States v. McEachin,* 216 U.S.App.D.C. 320, 325, 670 F.2d 1139, 1144 (1981) ("exigency was heightened by the fact that the evidence

about to be removed was a deadly weapon"); *United States v. McKinney,* 155 U.S. App.D.C. 299, 301, 477 F.2d 1184, 1186 (1973) (per curiam) (presence of sawed-off shotgun in hotel room was "an ominous threat in and [of] itself"). In addition, the police knew that if the gun remained in the house after appellant and Jones were removed, the other members of the family who had not been arrested would still have access to it and could use or destroy it. *Cf. United States v. Socey,* 269 U.S.App.D.C. 453, 846 F.2d 1439 (1988) (reasonable belief that evidence inside a home will be destroyed can be established by showing "1) a reasonable belief that third persons are inside a private dwelling and 2) a reasonable belief that these third persons are aware of an investigatory stop or arrest of a confederate"). Despite Jones' assurances, the police reasonably could have believed that other family members knew of the gun's whereabouts. Even if Mrs. Stewart had no prior knowledge of the gun or its hiding place, the police were aware that she was standing nearby while they were questioning Jones and easily could have overheard his responses. They also knew that her husband was expected to return that evening and might know about the gun. Thus, the exigencies present when the officers entered the house did not disappear simply because all persons in the house apparently had been located and the suspects had been arrested. The government has met its burden "to show that there was a need that could not brook the delay incident to obtaining a warrant...." *Dorman, supra,* 140 U.S.App.D.C. at 320, 435 F.2d at 392.

The decision to search was also supported by the fact that the police had strong reason to believe that the gun was located in the attic space, as Jones had indicated. Since the attic space was accessible through appellant's bedroom ceiling, it was a logical and convenient place for him to hide the gun. The police also knew that appellant, who was found in that room during their initial search, had had an opportunity to hide the gun there after the shooting.

As in *Ruth, supra,* 438 A.2d at 1256, the search conducted in this case was brief and limited to the small area where the police had cause to believe the gun was located. At the time of the search, the police were lawfully on the premises and in the room from which the search took place. *Cf. Douglas–Bey v. United States,* 490 A.2d 1137, 1140 (D.C.1985) (Nebeker, J., concurring) (citing *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984); *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)) (reentry of officers to conduct general search for evidence unconstitutional without a warrant). Furthermore, the search entailed only a minor intrusion into the crawl space. Once the officers had reached in and recovered the weapons and the briefcase, the search ended. We hold that the search was a reasonable, limited protective search of the crawl space for weapons. Once the hatch was opened and the briefcase came into view, the officers were entitled to seize it as well. *See Hayden, supra,* 387 U.S. at 300–10, 87 S.Ct. at 1646–52; *Ruth, supra,* 438 A.2d at 1260; *Vance, supra,* 399 A.2d at 58–59 (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 466–71, 91 S.Ct. 2022, 2038–41, 29 L.Ed.2d 564 (1971)); *Miller, supra,* 145 U.S.App.D.C. at 315, 449 F.2d at 977; *Dorman, supra,* 140 U.S.App.D.C. at 322, 435 F.2d at 394.[3]

Consistent with our holdings in *Ruth* and *Vance, supra,* we hold that the search of the attic area and the seizure of the weapons and evidence did not violate Sturdivant's Fourth Amendment rights.

*AFFIRMED.*

MACK, Associate Judge, dissenting:

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed. 2d 290 (1978). The majority utters the words but ignores their meaning. It upholds a warrantless search of an attic crawl space reached through a closed trap door located above the defendant's bedroom, on the theory of "exigent circumstances." It recognizes the factual scenario (that the search was made after the defendant had been arrested and taken to police headquarters and after all occupants of the house had been located) but, in sweeping language, concludes that the presence of a weapon created an "immediate need to protect the officers as well as the community." In so doing the majority permits the "exigent circumstances" exception to swallow the Fourth Amendment.

The majority apparently recognizes that it can garner little support from the landmark ("hot pursuit," contemporaneous seizure with arrest) cases relied upon by the trial court. *See Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1966) and *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc). It bases its holding squarely upon this court's decisions in *Ruth v. United States,* 438 A.2d 1256 (D.C.1981) and *Vance v. United States,* 399 A.2d 52 (D.C. 1979). These cases are distinguishable, not only with respect to the degree of intrusion by the search but the alleged necessity for the search as a protective measure.

The majority points out that the issue in *Ruth,* as here, was the validity of a warrantless search for a weapon that took place after the defendant had been pursued to his house and arrested.[1] There the police, after the arrest, proceeded upstairs, and searched a bedroom where a sack of bloodstained money was discovered behind

---

**3.** Sturdivant also suggests that a warrant was needed for the search in question because it was an entry into a separate closed compartment outside of Sturdivant's reach. We disagree, and observe that *Chimel, supra,* does not rule out all contemporaneous searches to seize weapons. 395 U.S. at 752, 89 S.Ct. at 2034.

**1.** I dissented in *Ruth,* expressing the fear that the majority was "sanctioning conduct under the umbrella of 'exigent circumstances' which does violence to the Fourth Amendment." *Ruth, supra,* 438 A.2d at 1263 (Mack, J. dissenting). Today, the majority adds legitimacy to conduct further distorting the "specifically established and well-delineated" exception of exigency.

a dresser. In finding that exigent circumstances justified the warrantless search, this court focused on the fact that the police in arriving on the scene had seen Ruth, in the presence of another person, place something behind the dresser. The search in *Ruth*, therefore, was legitimate because the police were aware that a serious offense had been committed, the weapon had not been found, and another person had been present when the object thought to be the gun was hidden behind the dresser. *Id.* at 1260. However, *Ruth* does not give the police license to conduct a warrantless search simply because they believe a gun is present. Rather, *Ruth* permits the police to conduct a limited search for their own safety. The police could engage in " 'the precaution of ascertaining whether some other person was still lurking in a back room with the as yet undiscovered sawed-off shotgun.' " *Id.* (quoting *Vance v. United States, supra,* 399 A.2d at 58).

Similarly, in *Vance,* the police had seized two of three suspects believed to have been involved in an attempted armed robbery. After the arrests in an apartment, the officers searched a bedroom and discovered incriminating evidence, including a gun. This court upheld the search, concluding that the "police were justified in entering the bedroom as part of a protective search in a hot pursuit situation," *id.* at 56, and that "once the police were lawfully in the bedroom, their subsequent search and seizure of the various items of evidence was justified under the plain view doctrine...." *Id. Vance* is thus of little precedential help here. For here, even if the police were justified in searching the house "as part of a protective search in a hot pursuit situation," after the suspects were arrested and the house secured, it is not reasonable to believe, and the majority does not press, that such justification would extend to permit a search of the attic crawl space. Indeed the record belies this fact.

Thus, I read the record here as affirmatively showing that the officers were not conducting a protective search of the crawl space. It shows that after appellant had been arrested and removed, one of the several officers on the scene called for, and awaited the arrival of, a crime scene search officer. The crime-expert provided the gloves to an officer who ascended stacked furniture to remove the trap door, and thereafter methodically photographed the area and the items seized. The factual situation is akin to that in *Douglas–Bey v. United States,* 490 A.2d 1137 (D.C.1985) where Judge Newman writing on behalf of this court reversed and remanded the trial court's denial of a suppression motion on the authority of *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984).[2]

Here, the majority approach, reduced to its simplest terms, creates an exigency, by focusing on the presence of the gun in the house. It cites numerous cases for the proposition that "the presence of ... weapons creates a special exigency because of their potential threat to human life." Majority op. at 1342. Few would disagree with this general proposition. Yet it is not the presence of a gun alone that creates an exigency. Rather, there must be some reason to believe that the gun poses a threat to the police or to the public. One need only look at the cases cited by the majority. In *Gaulmon v. United States,* 465 A.2d 847, 850 (D.C.1983), for example, it was the presence of a "loaded revolver in plain view in a hotel room" which created the exigency. *See also United States v. McKinney,* 155 U.S.App.D.C. 299, 477 F.2d 1184 (1973) (per curiam) (presence of sawed-off shotgun *in hotel room* ). In *In re F.D.P.,* 352

---

**2.** In *Thompson v. Louisiana,* police were called to the defendant's house by her daughter who told the police that defendant had called to say she had murdered her husband and attempted suicide. The police were admitted to the house by the daughter who directed them to the room where the defendant and her victim were found. Thirty-five minutes after the unconscious defendant had been transported to the hospital and the house secured, homicide investigators entered the residence without a warrant, conducted a general exploratory search and seized evidence not in plain view. The United States Supreme Court held that a Louisiana Supreme Court decision upholding the warrantless "murder scene" search was in direct conflict with its holding in *Mincey v. Arizona, supra.*

A.2d 378 (D.C.1976), the exigency arose because the gun was hidden in bushes in an area frequented by children.[3] Here the weapon was not in plain view, it was not in a location of easy accessibility and there was no real threat of destruction. The majority's speculations about what the other occupants of the house knew and what they would do with that knowledge simply does not create "a need that could not brook the delay incident to obtaining a warrant." *Dorman v. United States, supra,* 140 U.S.App.D.C. at 320, 435 F.2d at 392. The suspects had been arrested and the house secured.

Finally, the majority points out that "the police had strong reason to believe that the gun was located in the attic space" and also that the "search was brief and limited." Both statements are true but irrelevant. They do not add support to the conclusion that the search was justified by exigent circumstances. They might have relevance, under a given factual context, to the argument that the search was incident to a valid arrest, or that the search was made incident to consent, but, as the majority concedes, the government chose not to advance those theories.

If the presence of a gun alone creates an "exigency" justifying a warrantless and intrusive search of a dwelling place, then the Fourth Amendment has lost its meaning. I have not had the discipline to simply conclude, in dissenting, as did Chief Justice Dixon of Louisiana in *State v. Thompson,* 448 So.2d 666 (La.1984) (cited with approval by the Supreme Court in *Thompson v. Louisiana, supra,* 469 U.S. at 21 n. 2, 105 S.Ct. at 411 n. 2, as well as Judge Newman in *Douglas–Bey v. United States, supra,* 490 A.2d at 1139): "I respectfully dissent. All it would take to make this search legal is a warrant."

---

**3.** In the other cases cited by the majority, the exigency resulted not because of the weapon's "potential threat to human life," but rather because of the real and substantial possibility that the gun would be discarded. *Derrington v. United States,* 488 A.2d 1314, 1324 (D.C.1985) (police

had obtained information that suspect was at a given location with murder weapon and likely to dispose of it); *United States v. McEachin,* 216 U.S.App.D.C. 320, 325, 670 F.2d 1139, 1144 (1981) (police learned that defendant was going to dispose of shotgun).