585 A.2d 167 (1991)
Janice WASHINGTON, Appellant,
v.
UNITED STATES, Appellee.
No. 88-933.
District of Columbia Court of Appeals.
Argued July 18, 1989.
Decided January 15, 1991.
Robert L. Leggett, Washington, D.C., appointed by the court, for appellant.
Bruce Delaplaine, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty., at the time the brief was filed, and Robert A. Spelke, Asst. U.S. Atty., were on the brief, Washington, D.C., for appellee.
Before FERREN and TERRY, Associate Judges, and MACK, Senior Judge.
MACK, Senior Judge:
Appellant Washington, having entered a conditional plea of guilty to charges of possession of a prohibited weapon (D.C. Code § 22-3214(a) (1989 Repl.)), and possession of unregistered ammunition, (D.C. Code § 6-2361 (1989 Repl.)), challenges the pre-plea denial by the trial court of her motion to suppress evidence. She contends that the trial court erred in finding that exigent circumstances justified the forced entry by police, acting without a warrant, into her bedroom, the search therein, and seizure of a gun. We agree and reverse.

I.
At approximately 1:45 p.m. on March 28, 1988, four officers of the Metropolitan Police Department responded to a Clifton Street, N.W. apartment, after receiving a radio call concerning "a woman with a *168 gun." A young woman answered the officer's knock at the door. She appeared to be upset and told the officers "my sister has a gun, and I want it out of the house." While one of the officers remained with the young woman, the other three proceeded down a hallway to the room pointed out as appellant's room. (The apartment was owned by the mother of the sisters.) The bedroom door was locked. The officers knocked and asked the occupant to come outside. Receiving no reply, they waited a few seconds, than forced the door open, breaking it off its hinges. In the room, the officers found appellant and her three-year-old son sitting on a bed. No other occupants, other than the sisters and the child, were in the apartment at this time.
The officers asked appellant "Where is the gun?" She replied, "I have no gun." Appellant's son was removed from the room, and two of the officers began searching for the gun, while the other one kept his attention fixed on appellant. One officer looked into a clothes closet and proceeded to pat and examine the articles inside. He took a closed shopping bag off the shelf, in which he felt a hard object. Opening the bag, he found a loaded semi-automatic machine gun. Appellant was arrested. A motion to suppress was denied. A conditional plea of guilty was entered and this appeal followed.

II.
"`[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendmentsubject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (citations omitted). One exception is that of "exigent circumstances." When a trial court has concluded that exigent circumstances justify a warrantless search, our review entails nothing more complex than examining the facts as perceived by the police at the time of the search. We accept the trial court's findings unless they are clearly erroneous. Gant v. United States, 518 A.2d 103, 107 (D.C.1986); Derrington v. United States, 488 A.2d 1314, 1323 (D.C.1985), cert. denied, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). Facts being what they are, however, they must be examined in the context and sequence in which they occur. For example, exigent circumstances in a fast-moving street encounter may not be exigent circumstances in another factual context. In this regard, it bears repeating once again that the constitutional interest which protects a home against intrusion is a precious one. As the Supreme Court has noted:
We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was not done to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade the privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing, and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to the constitutional requirement and excuse the absence of a search warrant without showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.
McDonald v. United States, 335 U.S. 451, 455-56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).
Under the facts of this case, we are hard pressed to conclude that the exigencies of the situation made the warrantless, forcible entry and search of appellant's bedroom imperative.[1]

*169 A.
The trial court, in finding that the police in this case acted reasonably under exigent circumstances, relied upon Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc), involving circumstances similar to hot pursuit and ending with contemporaneous seizure with arrest. Dorman established a seven-prong query for judging the validity of warrantless searches of dwellings and seizure therein: i.e., whether, (1) a grave offense was involved, particularly a crime of violence; (2) the suspect was reasonably believed to be armed; (3) there was a clear showing of probable cause; (4) there was strong reason to believe that the suspect was in the dwelling; (5) there was a likelihood of escape if the suspect was not swiftly apprehended; (6) the police effected a peaceful entry as opposed to a breaking; and (7) the entry occurred during night. Dorman, supra, 140 U.S.App.D.C. at 320-21, 435 F.2d at 392-93; see also United States v. Lindsay, 165 U.S.App.D.C. 105, 110, 506 F.2d 166, 171 (1974) (summarizing the Dorman test). To the extent that Dorman could be controlling, it does not support the finding of exigent circumstances in the instant case. Contrary to the finding of the trial court, and the position taken by the government, the officers, at the time of entry, lacked probable cause to believe that any criminal activity had occurred, let alone the commission of a grave offense. Although the officers had information that appellant possessed a gun, they did not know what kind of gun she possessed, whether the gun was registered, whether appellant was licensed to, or did in fact, carry it, or whether she had used it. The mere possession of a gun in a dwelling place, without more, is not a criminal offense.[2] For all they knew, at the time they entered appellant's bedroom, the officers were intervening to recover a lawfully owned, registered gun. Prior to the forcible entry and discovery of the gun, therefore, there was no probable cause to believe that Janice Washington had committed any crime.
This case, therefore is readily distinguishable from the case of Sturdivant v. United States, 551 A.2d 1338 (D.C.1988), relied upon by the government. In that case the police had probable cause to believe that Sturdivant was the armed robber who had shot a woman law school professor in the head, and fled, together with an accomplice, with her briefcase. This court, speaking for a majority of the panel and upholding a warrantless search of the suspects' house after the suspects had been arrested, relied (understandably) not so much on the Dorman rationale of hot pursuit, as the fact that the police knew that a serious crime had been committed, that a shotgun had been used, that the shotgun had not been retrieved, and most importantly, that other members of the family who had not been arrested would still have access to the shotgun. See also Ruth v. United States, 438 A.2d 1256, 1260 (D.C. 1981). Sturdivant cannot be used for the proposition that an exigency is created by the presence of a gun in a residence where there is no probable cause to believe, as here, that the gun is a dangerous or illegal one used in the commission of a crime, or *170 where, indeed, no probable cause existed to believe that a crime has been committed.
Moreover, it is not enough that the suspicions of the police were ultimately vindicated by their discovery of an illegal weapon in appellant's closet. The police must have probable cause connecting a suspect to a crime before they invade constitutionally protected interests to obtain evidence; they must enter with a view to effecting a lawful arrest, and not merely on a "fishing expedition" to obtain incriminating evidence. The purpose of the exigency exception is to protect officers, bystanders, and identified evidence, and to secure suspects; it is not to facilitate exploration, or the obtainment of evidence to verify mere suspicions. See generally In re B.K.C., 413 A.2d 894, 902-04 (D.C.1980). Thus, in Lindsay, supra, 165 U.S.App.D.C. at 110, 506 F.2d at 171, the court held that even though the suspect had committed a crime of violence and was reasonably believed to be armed, a warrantless entry by police officers into a motel room occupied by the suspect was invalid and required the suppression of evidence found in the room subsequent to entry, because the officers had no evidence connecting the suspect to a crime at the time of entry. The Lindsay court explained:
At the time of the entry, the police possessed no evidence at all connecting Lindsay to the crime.... The room was slowly entered, evidence of the crime then began to be discovered, and only then was Lindsay arrested. This sequence of events undercuts the Government's assertion that they clearly had probable cause to arrest appellant at the time of entry. The fact that once inside the police search uncovered ample evidence to establish probable cause has no relevance here.
Id. at 110, 506 F.2d at 171. Where, as here, the police entered without a warrant or probable cause, any evidence that they subsequently obtained is generally subject to exclusionary rules, and should have been suppressed.
Further, it is apparent that, even apart from the continuing absence of probable cause, the moment was not ripe with exigency after entry. As the court observed in United States v. Irizarry, 673 F.2d 554, 557 (1st Cir.1982), "`[e]xigent circumstances' have traditionally been found in those crisis situations when there is compelling need for official action and no time to secure a warrant" (emphasis added). Here, it is implausible that exigent circumstances made it vital for the officers to prosecute their warrantless search. Upon entering the room, they found Ms. Washington and her three-year-old son sitting peacefully on a bed. Her hands were in plain view; she was under the continuing scrutiny of a police officer. The three officers present had taken effective control of the situation, and neither they nor any other persons were threatened by the possibility that she would retrieve the gun and either use it or dispose of it. The case bears comparison with the Supreme Court's precedent in United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), where the Court applied the exclusionary rule to evidence recovered from a footlocker seized by police officers, holding that "[t]he initial seizure and detention of the footlocker ... were sufficient to guard against any risk that evidence might be lost. With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of search without a warrant." Id. at 13, 97 S.Ct. at 2484-85 (footnote omitted); see In re B.K.C., supra, 413 A.2d at 903. We owe constitutional deference to a person's expectations of privacy in her own home, and therefore we must hold the police to the same standards, in intruding upon that privacy, as we would require in securing her personal property.
Without supporting its position, the government contends that the officers did not have time to secure a warrant. The circumstances discussed above belie this contention. With three officers in her bedroom, there was virtually no chance that appellant would escape or dispose of incriminating evidence while awaiting the issuance of a warrant. As Justice Douglas wrote in McDonald, supra, 335 U.S. at 455, 69 S.Ct. at 193, "No reason, except inconvenience *171 of the officers and delay in preparing and getting papers before a magistrate, appears for the failure to seek a search warrant. But those reasons are no justification for by-passing the constitutional requirement...." Here, the police might have encountered more serious problems attempting to obtain a warrant without showing probable cause.
Gaulmon v. United States, 465 A.2d 847 (D.C.1983), does not compel a different result. There, the defendant had checked into a transient hotel. Id. at 853. Upon temporarily leaving the hotel, he asked a maid to enter his room for the purpose of leaving some fresh linen. She saw a handgun lying on top of the dresser. She then notified the manager, who called the police. When officers arrived, they entered without a search warrant and removed the gun from the room. They further ascertained the defendant's identity from hotel records. Finding that he was not licensed to carry the weapon on the streets of the District, they obtained a warrant for his arrest, which was perfected the next day. In denying his motion to suppress the weapon, the trial court reasoned that since the gun belonged to a person who in all likelihood was not a resident of the District, and since it was therefore probably carried on District streets, there was some real and present danger to the public. Hence, the officers were justified, by the exigency of the situation, to effect a warrantless search and seizure. Id. at 849.
The case on appeal is distinguishable from Gaulmon. Here a private dwelling was involved. Moreover, the officers lacked probable cause to believe that Janice Washington, prior to their intrusion into her bedroom, had carried an illegal weapon on the streets of the District. The mere fact that her sister appeared to be upset did not constitute grounds for forced entry and seizure. Unlike Gaulmon, the officers could have established probable cause merely by asking the appellant's sister about the size and nature of the weapon, whether it was registered, and whether it was used to threaten her. Since the officers did not do so, the intrusion and seizure cannot be supported.

B.
Finally, the government can draw no solace from the "emergency entry to deal with danger of bodily harm situation" exemplified by this court's decision in United States v. Booth, 455 A.2d 1351 (D.C.1983). Indeed, for purposes of Tuck[3] and Dorman, at least, one might question the government's broad assertion that "[t]his court has flatly rejected appellant's argument that the police needed probable cause to believe a crime was being committed...." This court in Booth held what is obvious  that a policeman in the line of duty responds initially just as a fireman does, to an emergency call for help. This is obvious from the facts and holding of that case. Thus, in Booth, an officer received a radio report of an "assault in progress." When he arrived at the reported address, he was met by the appellee, who had dried blood on his nose. The officer asked Booth whether he had called the police, and Booth answered negatively. However, the blood on Booth's nose gave the officer "reason to believe the somebody in there had been injured." Id. at 1352. When Booth would not respond when the officer asked why he had blood on his nose, the latter crossed the threshold. From the hallway, he peered inside the living room "to see if anybody was hurt." Id. He asked people inside if anyone had called the police. Upon being told that no one had called the police, he turned to leave. As he reached the front door he heard a door open on the second floor; he looked up and saw the complaining witness, whose face was covered with blood. The complainant told the officer that the people downstairs, including Booth, had attacked him. The officer then placed Booth under arrest. Id. at 1352-53. In reversing the trial court's decision that the entry was unjustified, this court noted that the officer, while lacking *172 probable cause to believe that an assault had taken place (a finding made by the trial court), did have probable cause to believe that someone had been injured and, thus, was in need of assistance. We strictly circumscribed such entries:
First, the police officer must have probable cause, based on specific articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm inside the premises. Second, the entry must be tailored carefully to achieve that objective ...; the officer can do no more than is reasonably necessary to ascertain whether someone is in need of assistance, and then to provide that assistance. Finally, the entry must not be motivated primarily by the intent to arrest or to search, but by an intent to investigate a genuine emergency and to render assistance.
Id. at 1355-56 (footnotes omitted; emphasis supplied).
Applying the Booth test to the instant matter, we cannot condone the entry. The officers may have surmised the entry was necessary to assist someone in danger inside the house. It is at the second and third prongs (that the officer can do no more than ascertain whether someone is in need of help, and to render that help, and that the entry may not be motivated by an intent to search) that the infirmity of the government's argument becomes apparent. Once the officers saw that appellant's sister was in the living room by herself, out of harm's way, they should have ceased their search immediately, or inquired into the nature of the weapon and the reason that she called the police before proceeding. It can only be concluded that the entry into the bedroom was motivated by an intent to arrest and search.

III.
Since appellant's Fourth Amendment rights were violated by an impermissible search of her bedroom, the evidentiary fruits of that search should have been excluded at trial. The police lacked probable cause or exigent circumstances permitting entry into appellant's bedroom. A warrantless search, unsupported by probable cause or imminent emergency, cannot be supported.
Reversed.
TERRY, Associate Judge, dissenting:
Although I agree with the general principles of law declared in the majority opinion, I cannot join my colleagues in their application of those principles to the facts of this case. I would affirm the denial of the motion to suppress the gun on the ground that the police were justified by exigent circumstances in doing exactly what they did. As I see it, the critical fact confronting the police officers was the locked bedroom door. Having been told by appellant's sister that appellant was in the bedroom behind that door with a gun  an Uzi machine gun, as it turned out, though they did not know this at the time  and receiving no response when they knocked and asked appellant to come out, the police acted reasonably, in my judgment, when they forcibly entered the bedroom and seized the gun.[1]
The factors to be weighed by a court in assessing a claim of exigent circumstances are set forth in Dorman v. United States, 140 U.S.App.D.C. 313, 320-321, 435 F.2d 385, 392-393 (1970) (en banc), and summarized in the majority opinion, ante at 169. See also Sturdivant v. United States, 551 A.2d 1338, 1341 (D.C.1988), cert. denied, ___ U.S. ___, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989); United States v. Minick, 455 A.2d 874, 876 (D.C.) (en banc), cert. denied, 464 U.S. 831, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983). In each case the court must look to the particular facts before it in deciding whether the requisite emergency existed. United States v. McKinney, 155 U.S.App. D.C. 299, 301, 477 F.2d 1184, 1186 (1973). Furthermore, though there are seven "indicia of exigency" on the Dorman checklist, *173 we have made clear that they need not all be present to justify a warrantless search or seizure. Gaulmon v. United States, 465 A.2d 847, 850 (D.C.1983) (citing cases); see Derrington v. United States, 488 A.2d 1314, 1324 (D.C.1985). The presence and accessibility of a gun, in particular, can make "the situation more pressing and the emergency more critical" because of the potential threat to human life. United States v. Allison, 205 U.S.App.D.C. 270, 272, 639 F.2d 792, 794 (1980) (citations omitted); accord, Sturdivant v. United States, supra, 551 A.2d at 1342 (citing cases).
The officers arriving at appellant's home were informed by her sister that appellant was in the bedroom with a gun. Although it is not clear from the record that they then knew she had threatened to use the gun,[2] there was ample evidentiary support for the court's finding that "the officers were able to perceive the fright from the sister" and to determine, not only from her words but from the surrounding circumstances, that they were "presented [with] some life-threatening situation." Two more facts became known almost immediately: (1) the locked door, and (2) the lack of any response from appellant, whom they knew to be behind that door, when they knocked and asked her to come out.
I would hold that all of these facts, taken together, were sufficient to constitute "exigent circumstances" as that term has evolved in our case law. The police officers, faced with a threat of imminent physical danger, not only to themselves but also to appellant's sister, could not reasonably be expected to withdraw from the scene and seek a warrant from the handiest magistrate. Because the door was locked, they could not remove the threat of violence by any means other than breaking the door down and entering by force. Even their discovery of appellant sitting on the bed did not dissipate the threat, for they did not then know whether the gun was within her reach. Lieutenant Kishpaugh specifically testified on this point. He said that when he and another officer entered the bedroom, they found appellant sitting on the bed with her child. Kishpaugh looked around the room and saw no gun. He inquired, "Where is the gun?", and appellant replied, "I have no gun." When asked why he did not then leave to get a warrant, Kishpaugh said:
I wasn't really sure that she didn't still constitute a threat to myself and the other officer, sir. A few days prior to that, I had been on another assignment for a subject [with] a gun, and the subject had been sitting in a chair and sitting on the gun. [Emphasis added.]
Just as "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape,"[3] it did not require the police officers in this case to ignore the threat to their safety (and that of appellant's sister and son) presented by someone reliably[4] said to have a gun, even though no gun was visible at that moment.
Finally, I cannot agree that the exigency was dissipated when the police entered the room and found appellant and her son sitting peacefully on the bed. As a matter of common sense, the exigency would continue to exist until the gun was found, for until then the police could not be sure that it was beyond appellant's reach. She could have been sitting on it, as Lieutenant Kishpaugh's testimony suggests, or it could *174 have been under the pillow or the bedcovers, or even inside appellant's clothing.[5] In Sturdivant v. United States, supra, the appellant made a similar argument that the search for a sawed-off shotgun was invalid because it was not conducted until after the two suspects had been arrested and taken to the police station. We gave this argument short shrift:
At the time the police commenced the search, they knew that a sawed-off shotgun had been used in a serious crime and that it had not been retrieved. We have observed that the presence of such weapons creates a special exigency because of their potential threat to human life .... In addition, the police knew that if the gun remained in the house after appellant and Jones were removed, the other members of the family who had not been arrested would still have access to it and could use or destroy it.... Thus, the exigencies present when the officers entered the house did not disappear simply because all persons in the house apparently had been located and the suspects had been arrested.

551 A.2d at 1342 (citations omitted and emphasis added). Although Sturdivant is not precisely congruent with the instant case on its facts, I think it is close enough to serve as a dispositive precedent.
The Fourth Amendment does not prohibit all searches and seizures, but only those that are "unreasonable." I would uphold as reasonable everything that the police did in this case, and would therefore affirm the judgment.
NOTES
[1] We observe at the outset that there is no issue of consent in this case. Of course, a person other than the accused who has equal authority over the premises may admit police officers for the purpose of conducting a search. Derrington, supra, 488 A.2d at 1325. We have thus allowed a defendant's mother, as the lessee and person who exercised control over an entire apartment, to consent to a search of the defendant's bedroom and its contents. Id. Here, however, the sister of appellant lacked the requisite authority to permit a search of her sister's bedroom. The apartment belonged to her mother; she was not the lessee, and her authority to admit officers into the apartment did not extend to her sister's bedroom; her authority over that bedroom was not equal to appellant's authority. This is particularly true where appellant was present in her bedroom and did not give the police permission to enter.
[2] The possession of firearms in the District of Columbia is regulated by D.C.Code § 22-3204:

No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefore issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed....
[3] In Tuck v. United States, 477 A.2d 1115 (D.C. 1984), the officer, from a position where he had a right to be, personally observed circumstances which justified the entry of a pet store in the interest of preventing cruelty to animals.
[1] I agree with the statement in footnote 1 of the majority opinion that "there is no issue of consent in this case." On the facts before us, appellant's sister clearly had no authority to permit a search of appellant's bedroom.
[2] There was testimony from one of the officers, Lieutenant Lonnie Kishpaugh, that the sister said appellant "had threatened to hurt her with the gun," but that she did not make this statement until after the gun was recovered.
[3] Adams v. Williams, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922-23, 32 L.Ed.2d 612 (1972).
[4] This court, in a variety of factual settings, has often "presumed that a citizen is prima facie a more credible source than a paid police informant." Rushing v. United States, 381 A.2d 252, 255 (D.C.1977) (citation and footnote omitted). "If the citizen claims or appears to be a victim of a crime or an eyewitness to a crime, the reliability of his or her information is greatly enhanced." Allen v. United States, 496 A.2d 1046, 1048 (D.C.1985) (citations omitted). No claim is made in this case that the information provided by appellant's sister was not reliable.
[5] At this point the police did not know that the weapon was a machine gun; they knew only that it was a "gun" of some kind, not further identified.